# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JUSTIN L. SUTTON, as Personal )
Representative of the ESTATE OF )
HARTWELL LANIER KING, SR., and )
BETTY K. SUTTON, Individually, )
                                    )             1:21CV95
           Plaintiffs, )
                    )
           v. )
                    )
ROCKINGHAM COUNTY, *et al.*, )
                    )
           Defendants.

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

      Hartwell Lanier King, Sr. ("Mr. King") died at his home on October 4, 2020, and Mr. King's daughter, Plaintiff Betty Sutton, individually, and Justin Sutton, as personal representative of Mr. King's estate, (collectively, "Plaintiffs") brought this action. (ECF No. 1 at 1–2, ¶ 7.) Following this Court's Memorandum Opinion and Order on March 30, 2022, (ECF No. 20), addressing Defendants' Motion to Dismiss several of Plaintiffs' claims, the only claim remaining in this lawsuit is Plaintiffs' North Carolina law claim for wrongful death against Defendants Taylor Carter, Paul Higgins, Chasity Wall, and Deputy Sheriff Terry Gautier (collectively, "Defendants" or "Individual Defendants"). Now before the Court is Defendants' Motion for Summary Judgment on Plaintiffs' wrongful death claim against Individual Defendants. (ECF No. 35.) For the reasons stated herein, Defendants' motion will be granted.

1

## I. BACKGROUND

On October 3, 2020, at approximately 10:30 AM, a Rockingham County Emergency Medical Services ("EMS") paramedics unit was dispatched to the residence of Mr. King in Reidsville, North Carolina, in response to a call regarding a patient experiencing potential respiratory distress. (ECF Nos. 35-1 ¶ 8; 35-2 ¶ 9; 35-3 ¶ 8; 35-10 at 54:23–55:8.) The paramedic unit included three paramedics: Defendants Taylor Carter, Paul Higgins, and Chasity Wall (collectively, "EMS Defendants"). (ECF Nos. 35-1 ¶ 8; 35-2 ¶ 9; 35-3 ¶ 8.) Upon EMS Defendants' arrival at Mr. King's residence, Benjamin Fullerton, Mr. King's home health aide, informed them that he believed Mr. King was experiencing increased respirations and a fever. (ECF Nos. 35-1 ¶ 9; 35-2 ¶ 10.) Mr. King was 94 years old and suffered from quadriplegia, which confined him to a bed for seventeen years. (ECF Nos. 35-6 ¶ 1; 37-9 at 17:8-12, 38:3-5, 131:16-22.)

After conducting a medical assessment of Mr. King that involved taking vital signs and temperature, Defendants Carter and Wall determined that Mr. King had a fever, a lower-than-normal oxygen level, and an elevated respiratory rate. (ECF Nos. 35-1 ¶ 12; 35-2 ¶ 13.) Defendants Carter and Wall also determined that, due to these conditions, Mr. King needed to be transported to the hospital for further medical treatment and evaluation. (ECF Nos. 35-1 ¶ 14; 35-2 ¶ 16.) Defendants Carter and Wall then informed Mr. King that, based on his vital signs, he needed to be transported to the hospital; however, Mr. King verbally communicated to them that he did not want to go to the hospital, specifically stating, "No, I don't want to go to the hospital. I'm not going." (ECF Nos. 35-1 ¶ 14; 35-2 ¶ 16.)

After Defendants Carter and Wall again informed Mr. King that he needed to be transported to the hospital and explained that he could be risking death by not going, Mr. King

2

again refused transport. (ECF Nos. 35-1 ¶ 15; 35-2 ¶ 17.) Mr. King repeatedly refused transport after multiple attempts of Defendants Carter and Wall to convince him otherwise. (ECF Nos. 35-1 ¶ 15; 35-2 ¶ 17; 35-8 at 46:18–47:17.) Defendants Carter and Wall then conducted a capacity assessment on Mr. King in order to determine whether he had the mental capacity to decide to refuse transport to the hospital. (ECF Nos. 35-1 ¶¶ 16–17; 35-2 ¶¶ 18–19.) It was determined that Mr. King was "alert, oriented and did not have an altered mental status," and that Mr. King had the capacity to make his own decision regarding transport to the hospital. (ECF Nos. 35-1 ¶ 19; 35-2 ¶ 21.) EMS Defendants conducted several capacity assessments throughout their visit on the morning of October 3, and consistently arrived at this same determination that Mr. King had the capacity to make his own decisions. (ECF Nos. 35-1 ¶ 19; 35-2 ¶ 21; 35-3 ¶¶ 14, 17–18.)

Following Mr. King's continued refusals, Defendant Carter asked Mr. Fullerton if there was a family member that EMS Defendants could contact who could convince Mr. King to agree to be transported to the hospital. (ECF No. 35-9 at 58:9-15.) Mr. Fullerton called Plaintiff Betty Sutton, Mr. King's daughter. (ECF Nos. 35-1 ¶ 22; 35-2 ¶ 26.) When Defendants Carter and Wall spoke with Plaintiff Betty Sutton on the phone, they explained Mr. King's medical condition, that he was alert and oriented to person, place, and time, and that he was refusing transport to the hospital. (ECF Nos. 35-1 ¶ 23; 35-2 ¶ 27.) Plaintiff Betty Sutton stated that she was Mr. King's power of attorney, and that she desired for him to go to the hospital. (ECF Nos. 35-1 ¶ 24; 35-2 ¶ 28; 35-9 at 59:23–60:1.) Defendant Carter and Wall explained that because Mr. King was alert, oriented, and had the capacity to make his own decisions, a power of attorney was not relevant. (ECF Nos. 35-1 ¶ 24; 35-2 ¶ 28.) During the same phone conversation, Plaintiff Betty Sutton spoke with Mr. King in an attempt to

3

convince him to go to the hospital.  (ECF Nos. 35-1 ¶ 23; 35-2 ¶ 27.)  Mr. King again refused.  (ECF Nos. 35-1 ¶ 23; 35-2 ¶ 27.)  Before the conclusion of the phone conversation, Plaintiff Betty Sutton informed Defendants Carter and Wall that she was on the way to Mr. King's residence.  (ECF Nos. 35-1 ¶ 24; 35-2 ¶ 28.)

While awaiting Plaintiff Betty Sutton's arrival, EMS Defendants requested that a local law enforcement officer be dispatched to Mr. King's residence to "serve as a signatory witness" that Mr. King was refusing transport to the hospital.  (ECF Nos. 35-1 ¶ 25; 35-2 ¶ 29.)  Plaintiff Betty Sutton arrived at Mr. King's residence, and Defendant Terry Gautier, a Rockingham County Deputy Sheriff, arrived shortly after her to witness Mr. King's refusal of transport.  (ECF Nos. 35-1 ¶ 26; 35-2 ¶ 30; 35-3 ¶ 12.)  Despite additional attempts to convince him to decide differently, Mr. King continued to refuse transport to the hospital.  (ECF Nos. 35-1 ¶ 27; 35-2 ¶ 31; 35-3 ¶ 17.)  In Plaintiff Betty Sutton's presence, Defendant Higgins conducted another capacity assessment of Mr. King, and it was again determined that Mr. King had the capacity to make his own decision regarding transport to the hospital.  (ECF No. 35-3 ¶¶ 17–18.)

Once it was clear that Mr. King was not going to agree to be transported to the hospital, Defendant Carter completed a Patient Refusal Form for Mr. King, which is a standard form that is completed when a person refuses further medical evaluation, treatment, and transport to a medical facility.  (ECF Nos. 35-1 ¶ 28; 35-2 ¶ 32.)  Because Mr. King was physically unable to sign the form, and because Plaintiff Betty Sutton refused to sign the form, Mr. King verbally authorized Mr. Fullerton to execute the form on his behalf.  (ECF Nos. 35-1 ¶ 28; 35-2 ¶ 32.)  Deputy Gautier "witnessed the form" to reflect that Mr. King refused transport to the hospital.  (ECF Nos. 35-1 ¶ 28; 35-2 ¶ 32.)

4

Before departing Mr. King's residence, Defendants Carter and Wall informed Plaintiff Betty Sutton that, if Mr. King changed his mind, became unconscious, or if his condition further declined, she should call Rockingham County EMS for transport to a hospital. (ECF Nos. 35-1 ¶ 29; 35-2 ¶ 33; 35-9 at 80:2-8.) They also advised her to call Mr. King's primary care physician. (ECF No. 35-9 at 80:7-8.) Defendants left the scene at approximately 12:00 PM. (ECF Nos. 35-2 ¶ 33; 35-4 ¶ 11.) The next morning, Plaintiff Betty Sutton called 911 after finding Mr. King unresponsive with faint to little pulse. (ECF No. 37-9 at 127:12–128:18.) A different EMS unit arrived, (*id.* at 129:9–11), and transported Mr. King to the hospital, (*id.* at 129:20–130:13). Mr. King was pronounced dead upon arrival at the hospital due to cardiac arrest. (*Id.* at 130:7-16.)

Plaintiffs filed this action on February 3, 2021, (ECF No. 1), and filed an Amended Complaint (the "Amended Complaint") on March 11, 2021, (ECF No. 9). In the Amended Complaint, Plaintiffs allege claims against Rockingham County and Individual Defendants for violation of Mr. King's and Plaintiff Betty Sutton's civil rights under the Fourteenth Amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983 and for wrongful death pursuant to N.C. Gen. Stat. § 28A-18-2. (*Id.* ¶¶ 30–46.) Plaintiffs additionally allege that Rockingham County maintained liability insurance at all relevant times with Traveler's Indemnity Company, who was also named as a Defendant. (*Id.* ¶ 9.)

On March 30, 2021, Defendants filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), (ECF No. 15), and also filed an Answer to the Amended Complaint, (ECF No. 17). On March 30, 2022, this Court filed a Memorandum Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss. (ECF No. 20.) The motion was granted as to Plaintiffs' claims arising under 42 U.S.C. § 1983 against all

5

Defendants, Plaintiffs' wrongful death claim against Rockingham County, Plaintiffs' claims against Traveler's Indemnity Company, and Plaintiffs' claims for punitive damages against Rockingham County. (*Id.* at 15.) The motion was denied as to Plaintiffs' wrongful death claim against each Individual Defendant. (*Id.*) Defendants now move for summary judgment on the remaining wrongful death claim.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (citations and internal quotation marks omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

## III.  DISCUSSION

Defendants argue that the Court should rule in their favor on six bases, asserting that: (1) Defendants are entitled to summary judgment because Plaintiffs' wrongful death claim qualifies as a medical malpractice action and must be dismissed for failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure, (ECF No. 36 at 13); (2) Defendants are entitled to summary judgment because Plaintiffs provide no evidence establishing that Defendants' actions proximately caused Mr. King's death, (*id.* at 21); (3) the immunity provided under North Carolina's Emergency Disaster Treatment Protection Act, which was passed in response to COVID-19, bars Plaintiffs' wrongful death claim, (*id.* at 22); (4) Plaintiff Betty Sutton lacks standing to bring a wrongful death claim against Defendants, (*id.* at 24); (5) Defendant Gautier is entitled to summary judgment because Plaintiffs' wrongful death claim is barred by the public duty doctrine and public official immunity, (*id.*); and (6) Defendants are entitled to summary judgment on Plaintiffs' request for punitive damages, (*id.* at 26). In their Response, Plaintiffs oppose each of Defendants' six arguments. (*See generally* ECF No. 37.)

7

The Court will first consider whether Plaintiffs' wrongful death claim against EMS Defendants qualifies as a medical malpractice action and, if so, whether it complies with Rule 9(j).

### A. Wrongful Death Claim Against EMS Defendants: Qualification as Medical Malpractice or Ordinary Negligence

Defendants contend, in reliance on *Gause v. New Hanover Reg'l Med. Ctr.*, 795 S.E.2d 411 (N.C. Ct. App. 2016), and *Wood v. United States*, 209 F. Supp. 3d 835 (M.D.N.C. 2016), that Plaintiffs' claim sounds in medical malpractice because the mental capacity assessment that was conducted on Mr. King involves the application of specialized knowledge, labor, or skill that is predominately mental or intellectual, and an injury that results from these particular forms of specialization constitutes a claim for medical malpractice. (ECF No. 36 at 14–18.) Defendants further argue that, because this is a medical malpractice action and fails to comply with the certification requirements to maintain their action under N.C. R. Civ. P. 9(j), the law requires that Plaintiffs' wrongful death claim be dismissed. (*Id.* at 19–21.)

In response, Plaintiffs begin by noting that, in the Court's Order on Defendants' Motion to Dismiss, the Court concluded that Plaintiffs' Amended Complaint does not sound in medical malpractice, and that Plaintiffs were therefore not required to comply with the Rule 9(j) certification requirements to maintain their action. (ECF No. 37 at 9.) Also, using *Norris v. Rowan Memorial Hospital, Inc.*, 205 S.E.2d 345 (N.C. Ct. App. 1974), and *Lewis v. Setty*, 503 S.E.2d 673 (N.C. Ct. App. 1998) as support, Plaintiffs argue that expert testimony is not required to develop a case for negligence where the alleged breach of duty does not involve the rendering or failure to render professional nursing or medical services requiring special skills, or where the alleged conduct is a predominantly physical or manual activity that does not implicate the defendant's professional services. (ECF No. 37 at 10–11.) In addition,

8

Plaintiffs assert that this is an action "in ordinary negligence arising out of policy, management, county administrative decisions, customs, practices, and patterns that are procedural and administrative in nature." (*Id.* at 11.) As a result, Plaintiffs contend, they were not required to comply with Rule 9(j). (*Id.* at 13.)

In Defendants' Reply, Defendants argue that the Court's review of the wrongful death claim for failure to comply with Rule 9(j) on their Motion to Dismiss was based solely on Plaintiffs' pleaded allegations, and that since the entry of the Court's Order on that motion, evidence from discovery has shown that Plaintiffs' wrongful death claim sounds in medical malpractice as a matter of North Carolina law. (ECF No. 38 at 2.) Defendants contend that undisputed evidence shows that the issue of whether Mr. King had the capacity to make his own medical decisions required application of medical judgment by EMS Defendants and was not an administrative decision. (*Id.* at 3.) Defendants also assert that none of the evidence in this case implicates policy, management, or administrative decisions. (*Id.* at 6.)

Though the Court ruled on this issue in its Order at the motion to dismiss stage, that Order did not constitute a final ruling on the merits of the issue, as the "purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *See Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337, 1350 (Fed. Cir. 2018) (emphasis omitted) (quoting *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990)). Further, a motion for summary judgment implicates a wholly different standard of review, set forth above, that requires the Court to review the record as a whole, not just the pleaded allegations. Based solely on the allegations in the Amended Complaint, the Court made an initial conclusion that Rule 9(j) certification was not required to maintain Plaintiffs' action and was not grounds for dismissal at the motion

9

to dismiss stage. The Court will now conduct its analysis on this issue based on the evidence now presented in the record.

"Whether an action is treated as a medical malpractice action or as a common law negligence action is determined by [North Carolina] statutes." *Smith v. Serro*, 648 S.E.2d 566, 569 (N.C. Ct. App. 2007). Under North Carolina's statutes, a medical malpractice action is defined, in pertinent part, as "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11(2)(a). The statutory definition of "health care provider" includes any paramedic, as defined in N.C. Gen. Stat § 131E-155(15a). *Id.* § 90-21.11(1)(e).

Though the term "professional services" has not been defined by North Carolina's statutes, the North Carolina Court of Appeals has defined "professional services" as "an act or service arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor [or] skill involved is predominantly mental or intellectual, rather than physical or manual." *Sturgill v. Ashe Mem'l Hosp., Inc.*, 652 S.E.2d 302, 305 (N.C. Ct. App. 2007) (alteration in original) (citations and internal quotation marks omitted). Claims alleging injury that results from "activity that require[s] clinical judgment and intellectual skill," *Gause*, 795 S.E.2d at 415 (citing *Sturgill*, 652 S.E.2d. at 306; *Alston v. Granville Health Sys.*, 727 S.E.2d 877, 881 (N.C. Ct. App. 2012)), and "clinical patient care," *Littlepaige v. United States*, 528 Fed. App'x 289, 293 (4th Cir. 2013) (unpublished) (citing *Estate of Waters v. Jarman*, 547 S.E.2d 142, 145 (N.C. Ct. App. 2001)), have traditionally been classified as medical malpractice claims in North Carolina courts.

10

On the other hand, North Carolina courts have customarily classified claims alleging injury caused by "acts and omissions in a medical setting that were primarily manual or physical and which did not involve a medical assessment or clinical judgment" as ordinary negligence claims. *Gause*, 795 S.E.2d at 415–16 (citing *Horsley v. Halifax Reg'l Med. Ctr., Inc.*, 725 S.E.2d 420 (N.C. Ct. App. 2012)). Allegations of negligence "which arise out of policy, management, or administrative decisions" are also considered to "sound in ordinary negligence." *Littlepaige*, 528 Fed. App'x at 293. These latter decisions include "granting or continuing hospital privileges, failing to monitor or oversee performance of the physicians, credentialing, and failing to follow hospital policies," *id.* (quoting *Waters*, 547 S.E.2d at 145), as well as maintaining a policy of discharging patients when their insurance expires, *Muse v. Charter Hosp. of Winston-Salem, Inc.*, 452 S.E.2d 589, 594 (N.C. Ct. App. 1995), *aff'd*, 464 S.E.2d 44 (N.C. 1995).

In their arguments regarding whether Plaintiffs' claims sound in medical malpractice, Plaintiffs and Defendants disagree on the applicability of *Gause v. New Hanover Reg'l Med. Ctr.* In that case, a hospital patient was injured in a fall during an x-ray examination and brought a claim for ordinary negligence against a hospital. 795 S.E.2d at 413. In their interrogatory responses, the plaintiffs in that case "specif[ied] numerous contentions" that the hospital was negligent in "assessing the patient, inquiring about and reviewing the patient's medical history, and administering the x-ray." *Id.* at 416. The court held that "these services—assessment, inquiry, review, and administering a diagnostic imaging procedure—involve[d] specialized knowledge and skills which are predominantly mental or intellectual, rather than physical or manual." *Id.* (citing *Lewis*, 503 S.E.2d at 674).

11

Moreover, in *Gause*, the x-ray technician who handled the patient's x-ray examination process took the hospital patient into her care for the examination after receiving a nurse's order for "x-ray chest PA or AP," which meant that the technician was to choose one of two methods of imaging: a posterior-anterior chest x-ray or an anterior-posterior chest x-ray. *Id.* at 413, 417. The court held that the nature of the nurse's order, in providing alternative methods of imaging, "necessarily required" the technician to make a clinical judgment regarding how to administer the x-ray. *Id.* at 417. The court then concluded that the plaintiffs' claim sounded in medical malpractice and was subject to dismissal based on their failure to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. *Id.* at 418.

Here, while Defendants argue that the holding in *Gause* is instructive in the instant case, (ECF No. 36 at 14), Plaintiffs argue that this case is distinguishable from *Gause* because Plaintiffs' Amended Complaint alleges the injuries result from administrative and management deficiencies that do not arise out of the furnishing of professional services, rather than from activity requiring Defendants' medical assessment or clinical judgment while performing a medical or diagnostic procedure, (ECF No. 37 at 12). Plaintiffs then assert that "Defendants' failure to inspect, review and acknowledge" Plaintiff Betty Sutton's power of attorney instrument and Defendants' refusal to transport Mr. King to an emergency room for treatment by a qualified physician were not decisions that required medical judgment or medical diagnostic procedure, but instead were administrative decisions that required no medical expertise. (*Id.* at 13.)

Contrary to Plaintiffs' assertions, that an act or decision merely includes skills or decisions that, taken alone, sound in ordinary negligence does not necessarily mean the entirety of that challenged act sounds in ordinary negligence. This is exemplified in *Wood v. United*

12

*States*.  There, a plaintiff brought a negligence action against the United States as the executrix of the estate of her deceased husband.  *Wood*, 209 F. Supp. 3d at 837.  The plaintiff's husband, Mr. Wood, had surgery and died at a Veterans Affairs facility after the process of being transferred from an operating room table to a transport bed, during which a central line that was connected to Mr. Wood became disconnected.  *Id.* at 838–39.  Though the plaintiff contended that the labor or skill involved in transferring Mr. Wood from the operating room table was predominantly physical or manual, the court found that the case involved much more than physical movement.  *Id.* at 843.

The record in *Wood* indicated that Mr. Wood was connected to a number of medical devices at the conclusion of his surgery, including medication infusion pumps, monitoring devices, and a ventilator by multiple lines, wires, and a ventilating circuit and endotracheal tube.  *Id.*  For the transfer from the operating room table to be safely conducted, certain wires had to be correctly disconnected from devices and reconnected to other devices on the transport bed, specific medical devices had to be connected and moved with Mr. Wood, and certain tubes and lines had to remain connected to Mr. Wood.  *Id.*  Further, the plaintiff's expert, a cardiac anesthesiologist, testified about how the application of the correct standard of care would have prevented the dislodgment of the central line.  *Id.* at 844.

In holding that the claim sounded in medical malpractice, the court explained that "[m]anaging this complexity and prioritizing tasks, all necessary for a safe transfer, requires an understanding of the purpose and interaction of the various medical devices such that the required skill and knowledge is predominantly mental or intellectual."  *Id.* at 843–44.  The court found that the fact "that the transfer also require[d] the physical or manual skills of moving the patient's body [was] not determinative, because these skills [did] not predominate."

13

*Id.* at 844.  The court recognized that the standard of care that the expert sought to impose was "derived from his extensive medical experience" and held that "the fact that evaluating liability for the transfer [would] require the resolution of 'issues related to standards of medical care'" further supported the conclusion that the claim sounded in medical malpractice.  *Id.* (quoting *Littlepaige*, 528 Fed. App'x at 294).

Here, similar to *Wood*, this case "involves much more than" just the decision by Defendants to decline to transport Mr. King to the hospital.  The Court recognizes that there are multiple, distinct acts to be considered and evaluated in this situation: (1) the series of mental capacity assessments that were conducted by Defendants on Mr. King, (2) Defendants' decision to honor Mr. King's refusal of transport to the hospital, and (3) Defendants' decision to decline to recognize Plaintiff Betty Sutton's power of attorney.  As was true in *Wood*, to resolve whether the wrongful death claim sounds in medical malpractice or ordinary negligence, the Court must identify the applied skills or areas from which each act arises and determine which associated skill or area predominates.

### 1.    Which Skill or Area Predominates

The Court first considers the nature of the mental capacity assessments that EMS Defendants conducted on Mr. King.

In his affidavit, Dr. Jefferson Williams, a practicing EMS and emergency medicine physician, states that the determination of whether a patient has medical decision-making capacity is "one that is made by only a trained medical professional and is a medical decision in the course of concurrent clinical care."  (ECF No. 35-5 at 1, ¶¶ 2, 8.)  According to Dr. Williams, "[o]nly specially trained medical professionals (e.g. paramedics, EMS Physicians, Emergency Medicine Physicians) have the knowledge, education, and skill to judge the relevant

14

clinical factors in making a determination of capacity in the setting of an acute present illness."

(*Id.* ¶ 8.)

Defendant Chastity Wall, one of the EMS Defendants, states that she has attended "multiple paramedic courses" over her career on "how to conduct and interpret a capacity assessment performed on a patient" and that she has conducted hundreds of assessments on patients who refuse transport throughout her career. (ECF No. 35-1 ¶ 17.) Defendant Wall describes the purpose and process of conducting a capacity assessment:

> The purpose of a capacity assessment is to determine if the patient has the mental capacity to make his or her own decision on treatment or transport to a hospital. . . . The capacity assessment consists of a series of questions directed to the patient to determine if he or she is oriented as to person, place and time. For instance, the patient may be asked to state his or her name, what date it is, where they are currently located, and who is the current President of the United States. The paramedic listens to the responses given by the patient and observes the patient as the responses are provided. Based on the responses to questions, the observation of the patient at the time, and any other relevant factors present, a determination is then made by the paramedic whether the patient has the mental capacity to make his or her own decision regarding treatment or transport to a hospital. If it is determined the patient has the mental capacity to make his or her own decision, then the patient's decision regarding transport and treatment must be complied with by the paramedics.

(*Id.* ¶¶ 17–18.)

Defendant Wall also describes the series of capacity assessments that were conducted on Mr. King on October 3, 2020:

> I either was present for or personally conducted several capacity assessments on Mr. King while at his residence on October 3, 2020. Each time, Mr. King clearly and appropriately provided verbal responses to various questions regarding person, place and time. Based on these assessments, it was determined that Mr. King was alert, oriented and did not have an altered mental status. Mr. King had the capacity to make his own decision regarding transport to the hospital while we were present at his residence. In my experience and professional judgment as a paramedic, Mr. King's prescription medications would not have caused him to have an altered mental status at the time we were present.

15

(*Id.* ¶ 19.) These statements by Defendant Wall are consistent with the affidavits of the remaining EMS Defendants, Defendants Carter and Higgins. (*See* ECF Nos. 35-2 ¶¶ 19–21; 35-3 ¶¶ 15–18.)

Plaintiffs offer no evidence to refute the assertions in the affidavits of Dr. Williams and EMS Defendants regarding the skills and knowledge utilized during capacity assessments. This undisputed evidence in the record details the medical expertise and judgment that is required to conduct a capacity assessment. This undisputed evidence also specifies the purpose and process that were integral to the capacity assessments conducted on Mr. King on October 3, during which EMS Defendants applied their gained "experience and professional judgment." It is clear that the capacity assessments involved medical decisions that required clinical judgment and intellectual skill. Further, an "assessment" in a medical setting was held in *Gause* to be one of those services that sound in medical malpractice and involve "specialized knowledge and skills which are predominantly mental or intellectual." *Gause*, 795 S.E.2d at 416 (citing *Lewis*, 503 S.E.2d at 674). Thus, based on the evidence in the record, the Court finds that the mental capacity assessments conducted on Mr. King by EMS Defendants involved medical decisions that required clinical judgment and intellectual skill.

The Court next considers the nature of the decisions by EMS Defendants to honor Mr. King's refusal of transport to the hospital and to decline to recognize Plaintiff Betty Sutton's power of attorney.

Rockingham County's EMS Disposition Policy states:

Mentally capable patients maintain the right to refuse care and/or transport . . . . Patients who are not capable at the time of the EMS encounter and/or present a danger to themselves or others shall be transported to a local emergency department for mental health evaluation, or to an approved alternative destination. Providers should make every effort to transport patients with their

16

consent, regardless of capacity, however transport of incapacitated individuals may occur without their consent as necessary.

(ECF No. 37-5 at 7.)

Defendant Wall states in her affidavit that, because an alert and oriented patient has the right to make his or her own decisions concerning their health care needs, "consistent with Rockingham County EMS policy and procedures," a valid power of attorney "cannot override or substitute the decision-making authority of a patient who has shown the mental capacity to make his or her own decision[s], including the decision to refuse transport to a hospital." (ECF No. 35-1 ¶ 20.) Defendants Carter and Higgins make similar statements. (ECF Nos. 35-2 ¶ 24; 35-3 ¶ 19.) Defendant Wall also states that, in compliance with Rockingham County EMS policy and guidelines, "because Mr. King cleared the capacity assessment, was conscious, alert and oriented, and refused transport," EMS Defendants "could not force Mr. King to be transported to a hospital." (ECF No. 35-1 ¶ 30.)

Plaintiffs offer no evidence in the record that contradicts these determinations. In fact, Plaintiffs' own Amended Complaint bolsters the accuracy of these statements from EMS Defendants' affidavits regarding making these two decisions, as Plaintiffs allege in their Amended Complaint that EMS Defendants feared transporting Mr. King would constitute "kidnapping" and that EMS Defendants refused to recognize Plaintiff Betty Sutton's power of attorney.[1] (ECF No. 9 ¶¶ 18–19.) The decisions to honor Mr. King's refusal of transport to the hospital and to decline to recognize the power of attorney, viewed independently,

---

[1] More specifically, Plaintiffs' Amended Complaint alleges that EMS Defendants "deemed Mr. King's transportation to the emergency room facility that day as tantamount to 'kidnapping,' and thus refused to transfer Mr. King out of fear and reprisal that such action would result in the termination of their employment with Rockingham County." (ECF No. 9 ¶ 19.) Plaintiffs' Amended Complaint also alleges that EMS Defendants "disregarded the effect and enforceability" of the power of attorney instrument. (Id. ¶ 18.)

17

involved policy and administrative considerations that required no medical expertise. Thus, based on the evidence in the record, as Plaintiffs argue, the Court finds that these two decisions were legal and administrative decisions. However, under the facts of this case, that does not end our inquiry. The Court must now determine which of the skills exercised by EMS Defendants predominate the act that Plaintiffs allege to be negligent: EMS Defendants' decision to decline to transport Mr. King to the hospital.

The decisions to honor Mr. King's refusal of transport to the hospital and to decline to recognize Plaintiff Betty Sutton's power of attorney did indeed result in EMS Defendants' ultimate decision to decline to transport Mr. King. However, those decisions are "not determinative." *Wood*, F. Supp. 3d at 844. Those two decisions were only made because EMS Defendants conducted capacity assessments on Mr. King, and he successfully performed, demonstrating that he had the capacity to refuse transport to the hospital.

Had the capacity assessments yielded findings that Mr. King was incapacitated, EMS Defendants would have likely taken him to the hospital immediately, as they had determined that Mr. King needed evaluation at a hospital and his consent would not have been necessary for transport. (*See* ECF Nos. 35-1 ¶ 14; 35-2 ¶ 16; 37-5 at 7.) This is evinced by Defendants Carter and Walls' repeated efforts to explain to Mr. King that he needed to go to the hospital and to convince Mr. King to allow transport to the hospital. (*See* ECF Nos. 35-1 ¶ 15; 35-2 ¶ 17; 35-8 at 46:18–47:16.) Mr. King's successful performance on the capacity assessments was the primary reason for EMS Defendants' decision to decline to transport Mr. King to the hospital. Thus, the characteristics that are inherent in the capacity assessments—that is, the medical decisions that required clinical judgment and intellectual skill—predominate the ultimate decision made by EMS Defendants to decline to transport Mr. King to the hospital.

Because the clinical judgment and intellectual skill associated with the capacity assessments predominate, the Court holds that Plaintiffs' wrongful death claim against EMS Defendants sounds in medical malpractice.

2.     <u>Certification Under Rule 9(j)</u>

In North Carolina, the distinction drawn between a claim of medical malpractice and ordinary negligence is significant for several reasons, "including that medical malpractice actions cannot be brought without prior review of the medical care and relevant medical records by a person reasonably expected to qualify as an expert and to testify that the defendant provided substandard care." *Gause*, 795 S.E.2d at 415 (citing N.C. R. Civ. P. 9(j)). More particularly, Rule 9(j) mandates that the complaint alleging medical malpractice "specifically assert[ ]" that the medical care and relevant medical records have been reviewed by this person, and that this person is "expected to qualify as an expert witness under Rule 702 of the Rules of Evidence." N.C. R. Civ. P. 9(j)(1). Failure to allege compliance with Rule 9(j) in a complaint for medical malpractice requires dismissal. N.C. R. Civ. P. 9(j).

Here, both Plaintiffs' original Complaint and Amended Complaint are devoid of any assertion that the medical care and relevant medical records in connection with this matter have been reviewed by any expert witness. (*See generally* ECF Nos. 1; 9.) Nor was any such evidence presented. As a result, the Court concludes that Plaintiffs have failed to comply with Rule 9(j) and therefore Plaintiffs' wrongful death claim against EMS Defendants must be dismissed.

**B.     Wrongful Death Claim Against Defendant Gautier: Whether the Public Duty Doctrine or Public Official Immunity Applies**

The Court must next determine whether the wrongful death claim against Defendant Terry Gautier, a Deputy Sheriff for the Rockingham County Sheriff's Office, survives.

19

Defendants argue that Defendant Gautier's only role that morning of October 3, 2020, was to serve as a third-party witness to the fact that Mr. King refused transport to the hospital. (ECF No. 36 at 25.) Defendants assert that because Defendant Gautier did not conduct any assessment, and because he deferred entirely to EMS Defendants to determine Mr. King's capacity to make his own decision to not be transported, Plaintiffs' claim against Defendant Gautier is barred by the public duty doctrine. (*Id.* (citing *Scott v. City of Charlotte*, 691 S.E.2d 747, 753–54 (N.C. Ct. App. 2010); *Kelly v. Polk Cnty.*, 809 S.E.2d 408 (N.C. Ct. App. 2018) (unpublished)).) Additionally, Defendants argue that Defendant Gautier is also entitled to public official immunity, as Plaintiffs cannot present any evidence of malice, corruption, or willful and wanton conduct in Defendant Gautier's actions on October 3. (*Id.* at 25–26.)

Plaintiffs argue against the application of both the public duty doctrine and public official immunity. (ECF No. 37 at 18.) Plaintiffs contend that, despite knowing that Mr. King was suffering from a severe medical condition and being presented with Plaintiff Betty Sutton's power of attorney instrument, Defendant Gautier "refused to intervene or authorize Mr. King's transportation to the hospital" and "refused to acknowledge this instrument, thus exhibiting conduct willful, deliberate, and beyond the scope of his duties." (*Id.* at 20–21.) Plaintiffs assert that their claim against Defendant Gautier is not barred because Defendant Gautier arrived at the scene at the request of EMS Defendants for the purpose of witnessing a patient's refusal of transport, and because Defendant Gautier exercised no "independent judgment or discretionary decision-making" while present. (*Id.* at 22.) Plaintiffs further argue that Defendant Gautier unlawfully authorized the execution of the Patient Care Refusal Form and Liability Waiver, which they argue was obtained through "unfair bargaining power." (*Id.* at 23–24.)

The Court will next evaluate the applicability of (1) the public duty doctrine and (2) public official immunity to the facts of this case to determine whether either doctrine bars Plaintiffs' wrongful death claim against Defendant Gautier.

1. Public Duty Doctrine

Under "[t]he general common law rule, known as the public duty doctrine, . . . a municipality and its agents act for the benefit of the public, and therefore, there is no liability for the failure to furnish police protection to specific individuals." *Braswell v. Braswell*, 410 S.E.2d 897, 901 (N.C. 1991). The purpose of the public duty doctrine is to "shield[ ] the state and its political subdivisions from tort liability arising out of discretionary governmental actions." *Moses v. Young*, 561 S.E.2d 332, 335 (N.C. Ct. App. 2002) (alteration in original) (quoting *Stone v. N.C. Dep't of Lab.*, 495 S.E.2d 711, 716 (N.C. 1998)); *see Scott*, 691 S.E.2d at 752 ("This principle is grounded in the notion that an officer's duty to protect the public requires the officer to make discretionary decisions on a regular basis . . . ."). "[W]hen a police officer, acting to protect the general public, indirectly causes harm to an individual, the municipality that employs him or her is protected from liability." *Scott*, 691 S.E.2d at 752.

While Defendants rely on the *Scott v. City of Charlotte* and *Kelly v. Polk Cnty.* cases to support their position that the public duty doctrine applies in the instant case, such reliance is misplaced. In *Scott*, police officers stopped a motorist for erratic driving, and the motorist died hours later from a brain hemorrhage. 691 S.E.2d at 749–50. It was while the officers "were engaged in their general law enforcement duty to protect the public from an erratic driver who they believed could be intoxicated" that they "made discretionary decisions that indirectly caused harm to" the motorist, including the decision to leave the motorist without calling for medical assistance. *Scott*, 691 S.E.2d at 752–53 ("[U]nder the present facts, the

21

officers had to make a discretionary decision as to whether medical assistance was needed where neither Mr. Scott or his wife asked for assistance, and . . . Mr. Scott specifically declined medical assistance when asked if he needed it.").  Likewise, in *Kelly*, upon the officer's arrival on the scene in response to a 911 call alerting law enforcement of an unconscious driver in a vehicle, the officer's "evaluation of the scene ultimately led him to make the deliberate, discretionary decision that emergency medical attention . . . was not necessary."  809 S.E.2d 408, 2018 WL 718966, at *4.  The court there held that the officer's actions were discretionary because he made a deliberate decision that was "based on his personal observations at the time."  *Id.* at *5.

Here, no discretionary decision was made by Defendant Gautier while simultaneously protecting the general public.  The affidavits of Defendants Carter, Wall, and Gautier and the deposition of Defendant Carter indicate that EMS Defendants contacted dispatch for an officer to serve as a witness to Mr. King's refusal to be transported to the hospital.  (ECF Nos. 35-1 ¶ 25; 35-2 ¶ 29; 35-4 ¶¶ 4–5; 35-9 at 64:5-13.)  Paramedics contacting law enforcement for the sole purpose of witnessing a patient's refusal of care differs significantly from a civilian contacting law enforcement to respond to a situation, or law enforcement responding to conduct, that could jeopardize the safety of the general public.

Further, Defendant Gautier states that "Deputy Sheriffs do not . . . make any independent determination regarding whether a patient has the capacity to make his or her own decision regarding transport."  (ECF No. 35-4 ¶ 5.)  Defendant Gautier admits to relying "on the education, training and experience of the Rockingham County EMS paramedics to determine that Mr. King cleared the decision-making capacity assessment given to him" and states that his "role was solely to witness Mr. King's refusal of transport on the Patient Refusal

22

Form." (*Id.* ¶¶ 9–10.) Defendant Gautier's narrow, restricted role as a witness and his absolute deference to the training and experience of EMS Defendants in determining Mr. King's capacity to make his own decisions support that Defendant Gautier did not exercise any discretionary decision-making, let alone discretionary decision-making that required consideration of the safety of the general public. As a result, the public duty doctrine does not apply.

### 2. Public Official Immunity

"As public officers, . . . police officers and sheriff deputies are shielded from civil liability" in their individual capacities "'unless [they] engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of [their] duties; (4) in bad faith; or (5) willful and deliberate.'" *Jensen v. Jessamy*, 776 S.E.2d 364, 2015 WL 4448129, at *2 (N.C. Ct. App. 2015) (first alteration in original) (unpublished) (quoting *Reid v. Roberts*, 435 S.E.2d 116, 119 (N.C. Ct. App. 1993)). Under public official immunity, "[p]ublic officials cannot be held individually liable for damages caused by mere negligence in the performance of their governmental or discretionary duties." *Meyer v. Walls*, 489 S.E.2d 880, 888 (N.C. 1997).

Here, Defendant Gautier states in his affidavit that, on occasions where Rockingham County EMS requests assistance from the Rockingham County Sheriff's Office, "Deputy Sheriffs do not provide any medical treatment to the patient, or make any independent determination" regarding the patient's capacity to make his or her own decision about transport. (ECF No. 35-4 ¶ 5.) Defendant Gautier also states that "Deputy Sheriffs do not receive any specific training on capacity assessments and the effectiveness of powers of

attorney where, as here, a person is able to communicate his or her decision and affirmatively refuses medical treatment and transport." (*Id.* ¶ 9.)

Though Plaintiffs argue that Defendant Gautier's refusal to authorize Mr. King's transportation to the hospital and to acknowledge the power of attorney constituted "conduct [that was] willful, deliberate, and beyond the scope of his duties," (ECF No. 37 at 20–21), the record suggests quite the opposite. In response to a call from EMS paramedics, Rockingham County Deputy Sheriffs are not to make independent judgments or determinations as to the capacity of the patient and "rely on the training, education and experience of the EMS paramedics on the scene for those determinations." (ECF No. 35-4 ¶ 5.) It has been established that Defendant Gautier exercised no discretionary decision-making as to whether or not Mr. King would be transported to the hospital, and that he was only present to serve as a witness to Mr. King's refusal of care. Defendant Gautier was not trained to analyze capacity assessments or whether a power of attorney takes effect under circumstances where the patient is communicating his decision and is affirmatively refusing medical treatment and transport, as Mr. King was here.

Moreover, there is no evidence in the record suggesting that any action taken by Defendant Gautier was corrupt, malicious, or in bad faith. The evidence in the record shows that Defendant Gautier was acting directly within the scope of his duties as a Deputy Sheriff in this circumstance, and there is no credible evidence that the actions he took on October 3 to fulfill those duties were corrupt, malicious, or in bad faith. The Court finds Plaintiffs' arguments to the contrary unpersuasive.

Accordingly, the Court concludes that public official immunity does bar Plaintiffs' wrongful death claim against Defendant Gautier.

## C.     Conclusion

As this Court has held (1) that Plaintiffs' wrongful death claim against EMS Defendants sounds in medical malpractice, and that the claim has been barred due to Plaintiffs' failure to comply with Rule 9(j), and (2) that Plaintiffs' wrongful death claim against Defendant Gautier is barred by public official immunity, therefore no wrongful death claim exists.   Because the remaining four issues discussed by both Parties are contingent on the existence of a wrongful death claim, the Court need not address those issues, as they are now moot.[2]

Accordingly, Defendants' Motion for Summary Judgment will be granted.

For the reasons stated herein, the Court enters the following:

### ORDER

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (ECF No. 35), is **GRANTED**, and with there being no remaining claims, the action is **DISMISSED**.

This, the 6th day of November 2023.

/s/ Loretta C. Biggs
United States District Judge

---

[2] These four now-mooted issues concern whether Plaintiffs established proximate cause, whether the immunity under North Carolina's Emergency Disaster Treatment Protection Act applies, whether Plaintiff Betty Sutton has standing, and Plaintiffs' request for punitive damages.  *See* discussion *supra* Part III.

25